Call the case. Frank Russo vs. Corey Steel Company. Please step up and identify yourselves. Clifford Horowitz for the Plaintiff Appellant. John Piguori for the Defendant Appellee. Well, you know the normal length and we'll follow it pretty closely, but if there's a lot of questions, we'll give you some leeway. Thank you. All right. Proceed. May it please the Court, this is Clifford Horowitz. I think the main issue in this case, at least to me, is this ruling by Judge Sulganic that Judge Lynch apparently abused his discretion in allowing testimony that for 35 years I've been seeing come in where a doctor says, yeah, I do this for a living. Yeah, I recommend orthopedic surgery for hips. Yeah, I work for corporations. I make recommendations to corporations regarding hip surgery. I make recommendations to Canadian nationals. But this is not a surgeon. He's not a surgeon. He's a Ph.D. And right away I've got to ask you two questions. How many times has this guy testified for plaintiffs? Many. Has he ever testified for a defendant? I'm sure he has. I don't have the numbers. But he's a physician. He's an M.D. I know that, but I'm categorizing. I tend to think Judge Sulganic is more correct in this than you're giving him credit. Because this is a general surgeon versus a man that is not a surgeon and is nothing more than a plain old doctor. And his real doctor degree that he's using in this case is a Ph.D., not a medical doctor part. So I have severe concerns because nowhere in the testimony do I see anyone being able to testify to a reasonable degree of medical certainty that that's what should have occurred. I see nothing in any of the evidence. I see may, might, but I never see absolute. Okay. Well, there's a number of things you brought up. But first of all, he is a surgeon. He is a physician. He is a medical physician who practices, who's licensed in all of his branches. He is a doctor who routinely does examinations, makes recommendations for surgery as part of his profession. And he teaches physicians about hips. I mean, he's a teacher on it. So he qualifies under the law based on knowledge or based on education or based on experience. And the ultimate test is, is it beyond the ken of the ordinary jury? Is he helping? Absolutely. I mean, this is what he does. Corporations have been relying on him for 25 years to do this. So the similar case is I think this Parvin case where you have a radiologist testifying, yes, he needs back surgery. And I'm going to tell you the cost of those back surgery. And the appellate court said, absolutely fine. Yeah, but in that case, again, it was really a general surgeon. The radiologist was not a general surgeon. He's just a radiologist. You could argue, one could argue the radiologist is less qualified than the doctor in this case, who routinely, because radiologists do not examine. Correct. They don't send people back to work. That's what this guy does. He's an occupational medicine physician. So his job is to determine if people need to go back to work, if they don't need to go back to work, if they need surgery, if he agrees they need surgery. That's what he's been doing for years. There's not even any cross-examination on that issue. The defendants know this is true. They never cross-examine him on it. They never ask for any voir dire anything to question this. And when the doctor says, this is what I do, then that helps. That's beyond the kind of the ordinary jury. That assists the jury. So, I mean, it meets the test. There has not been one case in Illinois history that has reversed in a situation like this, or even held, where a court has said, I'm not going to allow the doctor to testify and didn't allow it. The abuse has been when they have not allowed it. Because when they say they have experience, they teach, they do this for a living, that's more. By far more than enough. A radiologist, all he does is look at films. He doesn't even look at patients. He definitely doesn't do surgery. Counsel, what do you do with the later testimony during cross-examination, when the doctor said, can't say to a reasonable degree of medical certainty, that it's more likely than not that there will be future hip surgery? Yeah, I think, why is that not walking back everything he said on direct? I think that's a great question. And that's what the defendant is arguing, that their cross-examination proves he's not qualified. Okay? Proves he shouldn't be. And there's a number of responses to that. Number one, if I'm going to cross-examine a doctor, let's say I have a really good cross, okay, and I wipe out a lot of this direct, which happens a lot. All I have to do under this new system is come into the appellate court and say, let's reverse it. I have a good cross. I don't have to make any objections. I don't have to do anything. I've got a good cross. We have a new trial. Because that's what's happening here. Now, that's the failure to object. Well, that's a little bit more than just a good cross, right? I mean, the whole argument here is, can Dr. Koh, that's his name, Dr. Koh, can Dr. Koh testify? Does he have the qualifications? Have you laid the foundation so that he can testify to a reasonable degree of medical certainty that future hip surgery is required? And then he gets up on direct and says, qualified or not, I can't say that. Okay. Well, and I just wanted to say, the only reason I was saying that is if you don't alert the court to it, there's not much the court's going to do. Okay? So let's wait. But, anyway, this has been, this very situation ended up in a reversal in the Hahn case where a judge, the trial judge, reversed himself and held where a doctor said that he could not state, this is Hahn, he struck the doctor's testimony where the doctor stated he could not say the surgery was related. But he said it might be related. And the court said you did not negate the might-be testimony, which is perfectly valid. And in this case, they didn't negate the might-be testimony because he said he may need future surgery. He said the first surgery was a factor causing the need for the second surgery. That was not negated. They did not negate no sudden break in causation, as defendant expert testified, because you know what they said. It's all related. This isn't related after a year and a half. So he said there was no break in the causation. And he said he may have arthritis, aggravation, therefore the need for surgery to the hip. So none of them may, yes, the more probably true than not, they negated that. But under Hahn, it's reversible error for even the trial judge to strike the testimony. And that's what would have happened here, I think, is a judge would have struck him. You didn't negate everything. And the Messick case held the same thing. You know, in that case, all the doctor said was that the condition was consistent with the injury. But on cross, he said there's no way to state the cause of the injury. Court held you didn't negate the comment that the condition was consistent with the injury. So there's no objection. So the judge can't do anything. Yeah, they have a nice cross, and then they didn't negate. So there's two separate reasons. But then you get to the third reason, and those are independent. The doctor didn't even say what surgery he was suggesting. He said, I recommend he go to a surgeon who would determine what kind of surgery he had. Mind you, this is a man without a labrum, because it was removed in the surgery, who's complaining of pain at a level of seven. Okay? This is what he's got to live with. He couldn't work like duty. He was taken off the job. He's complaining terribly of his hip. He's got arthritis, according to three physicians, including the defendant's experts. And the pride case says, you have arthritis? Then a doctor who testifies that it's possible that you need a knee surgery? Totally proper. So he had advanced, he had significant arthritis, according to three physicians. But my point is, remember the chiropractor case? There's the case where the chiropractor says, I would refer my patient to a surgeon for a surgical consultation. Now what's he saying to the jury? That jury's thinking, the guy's going to get surgery. This doctor thinks he needs surgery. Why else would he have said that? That's a chiropractor. It's not even a physician. My guy is saying, I would refer him to a physician who would determine what type of surgery he needs. Under cross, the defendant got my guy to say, all right, I would recommend at least a diagnostic surgery to see what's going on. Now, there's nothing wrong with any of this. This man is an experienced 25-year physician who's been doing this for 25 years, recommending surgeries to corporations, patients, and teachers. There's nothing wrong with it. But then you get to the next step. Let's say that this is somehow incorrect, which he did not abuse his discretion. The judge did not abuse his discretion. Let's say he abused his discretion. Then you get to, what's the alternative here? The guy's going to live in pain for the rest of his life at a level 7, which is basically uncontradicted. He's got arthritis, according to a defendant's expert and my experts and the plaintiff's expert. So he's just going to live with this. He's got to live with this forever. Or, in the alternative, he's going to have a diagnostic surgery and have some hope. Are you telling me the verdict changed because of that? I mean, the first situation is a far better situation for the plaintiff. You've got an uncurable condition. The second situation is there's hope for the guy. And then what you have is a jury awarded $150,000 for damages for future medical. I don't think they, you know, the doctor was saying could, might be, possibly surgery. I don't think they bought anything about surgery anyway. But there's no harm to saying, you know, we cited the Levin case. We cited two cases where they talked about not only, at first were critical that the defendant never objected. So, you know, what can you do if nobody objects during cross-examination or they get a nice cross-examination? But then those two courts hold the cross did so much damage to the testimony, it showed the, quote, tenuous nature of the opinions. It's tenuous. It wasn't prejudicial. It wasn't prejudicial to warrant a new trial. It's so severely prejudicial that it changed the outcome. So there's just multiple reasons. You know, this is a one sentence. This testimony was one sentence out of 1,000 pages where a doctor says, you know, I think you should go to a physician who can figure out what to do with your surgery. He's got no labrum and he's got arthritis and he's got pain of a seven. He's got pain. What is the proper standard for a judge to use to determine that there's an abuse of discretion by Judge Netsch? You know, that's a great question because, you know, defendants cited cases. We cited cases. You know our feeling that the Supreme Court has said you don't want to be inviting judge shopping because if you're allowed, the insurance company is allowed to say, you know, I've got 30 firms of work for me. Firm 29 is a conflict. I'm just going to bring them in. Then you get a new judge. And if the rule really is that a judge has full discretion, just like a trial judge, to use his discretion against the discretion of a trial judge who's sitting there, and because discretion is like if it's beyond fanciful, then it's, if it isn't beyond fanciful, then it's discretionary. So you've got both guys who, or both ladies or gentlemen, judges, both operating discretion, on discretion. No case in Illinois says that. And the cases we cited simply say, you know, exercise constraint. Be careful when you're dealing with the discretion of another judge. But should that deal, do those cases deal with anything beyond discovery orders? Did they deal with motions for new trial? It did not deal, they did not deal with discovery orders except for the one where there was a discretionary discovery order regarding the elimination of some medical testimony, I believe. So that was discretion on discretion. But motions for new trial, doesn't the case law say you treat the post-trial judge as if he or she were the trial judge? Absolutely not. The defendant cited four or five cases. Three of them were motions for summary judgment, of which the appellate court has a de novo standard. There's no discretion about. The other two or three that they cite, and I can identify them if you want, were cases where the defendant argued exactly what the defendant's argument here. And you know what the appellate courts did? They didn't discuss it. They just went to the trial judge abuses discretion. That's all they did. It's in our briefs. They never, ever say, post-trial motion, you can get a new judge, and guess what? He's going to exercise the same discretion. So if he doesn't like the ruling, he can just reverse. And you get a $9 million verdict. I don't like that. He can just reverse. Is there a case with these facts? This procedural posture. Not these facts. That's not what I meant. Is there a case with this procedural posture? You have a motion for new trial. A new judge comes in for whatever reason. In this case, I understand what you're saying about the conflict. You think it was an intentional thing. But, you know, maybe the other judge gets reassigned, gets promoted, retires, dies, whatever. A second judge comes in, and here's the motion for new trial. Is there a case that talks about the appellate standard of review? I'm trying to remember if the defendant cases were new trial cases. I thought that they cited cases that were new trial cases that said you treat the post-trial judge just like the trial judge. Oh, no. Oh, no, no, no, no, no, no. For a motion for new trial. But I would not want to be quoted on that. That's a question that's in all three of our minds. Sure. No, it's a very good question because it's a very important decision to make, because trial judges are given great latitude. And if you're now going to give great latitude to someone who wasn't even there, who can easily exercise his discretion and just go the reverse way on 100 rulings, well, then I don't see how you have a chance in this system. People v. Hampton. People v. Hampton is cited in the briefs at page 15, the brief of the court. Yeah, let me. Page 15. Okay. Hampton. This is what it says. Evidentiary ruling is the discretion of the trial judge. Does not mention the standard of care regarding the successor judge. Every case I looked at always concentrated on the discretion of the trial judge. Okay, well, let's do it like this. What if it were Judge Lynch? What if Judge Lynch did not accuse? Judge Lynch gets a motion for new trial. It says, Judge, we really want you to rethink this. You made a mistake on this ruling, and it was a material mistake. It was a meaningful prejudicial mistake. What would be the question Judge Lynch would ask himself? Well, I think, Judge. Would he say, was it an abuse of discretion, or would he say, did I get that wrong? No, Judge Lynch obviously can look at his own rulings. He was there. You know, he was present. He's the one who exercised the discretion. And Judge Lynch could say, well. Well, what would be the question he would be asking himself? I'm not trying to be cute. I think this is important. He would ask himself. Would he say, was there error, or would he say, did I abuse my discretion? I mean, that would be weird to reassess your own abuse of discretion, right, to be deferential to your own ruling. Wouldn't you go back? Honestly, I read the cases all the time. I've been doing it my whole career. I've never seen a case that said what is the – it simply says the trial judge has an abuse of discretion. That's what the cases repeatedly say. It doesn't say how the judge should look at himself is my reading. So if Judge Lynch had looked at this and said, you know what? In hindsight, looking at the whole trial, I think I got this one wrong. I don't think he laid the foundation. And it looks like the plaintiff played it up a little bit in the closing argument. You would argue we would have a different standard of review. You would say in that case we would be looking at whether any reasonable person would have adopted his view, if he granted a new trial, right? Because it's the same judge. I think he has discretion. I haven't seen a case exactly on point, but I can tell you that the Haun course does kind of address this because Haun, where the doctor said it might be the case, the trial judge did strike the testimony after the fact, and the appellate court reversed, said, no, no, no, they never negated might be. So they put a stop to that. So I don't know if Haun – But you think because we have a new post-trial judge that the standard of review for us is different, that we have to find some kind of a change in facts or circumstances? I think it should be addressed like every court has addressed it. Like Hampton, they just evaluate the discretion of the trial judge. Because to say that an appellate judge has full discretion, that's like you have nine out of ten ability to do whatever you want. So we don't review the ruling? If the post-trial judge gives a written ruling granting a new trial, we ignore it and we just go back to decide whether the trial judge abuses discretion? No, no, I think – We're reviewing it. I would think – So we've got the next ruling, right? Right. I would think it's – in my opinion, it's a de novo review because you're in the same position as the post-trial motion judge. He wasn't there. But my point is you've got a guy who's got nine out of ten discretion to do something. Now you've got another guy who's got nine out of ten. They're imposing on each other. It's not fair. It's not fair to the plaintiff. It's not fair to anybody. The – there was something that you said. Oh, you said we played it up and close. The defendant said we argued there would be three surgeries and close. Okay. Three surgeries. Remember, he needs a back fusion. He needs three areas of his shoulders repaired. And he needs maybe a diagnostic surgery here, which is nothing. So we could have argued he needs two surgeries and has permanent level seven arthritis, which has no cure. I mean, the verdict should be higher, could be higher, because he's basically crippled. And instead, there's some hope. He's got three surgeries he's got to go through, so the one is a diagnostic or a surgery to be decided by another physician. That is just harmless. It's just harmless. You know, these trials are expensive. Let me ask you. You were there. Yeah. We've got a verdict that, to me, having been in the law division for about four years and had a lot of PI cases, and it seems high, especially when there wasn't, as best I know, no evidence specific as to amounts. Money was never mentioned clearly as to how much, other than maybe in your closing, as to what the jury should come up with. In other words, you're talking about past medical, and those weren't necessarily exactly correlative as to what this would be seeking. I don't know if I'm making myself clear. I know the past medical was $150. He had two surgeries that the defendant admitted were related. Then you had the future medical. They gave it only $150. So they gave the same amount. So where did all the non-economic come from? Well, okay. And I'll say this. I don't agree with the remitter, obviously. But if this case is just too high and it needs to be remitted, then you're going to remit it. I don't think the jury's views should be substituted. But, you know, you guys, your honors, your justices, you have to make that decision. I want to remind the court that the defendant made a suggestion to the jury. They said, we have a year and a half of damages that are related. I mean, they admitted. They admitted, which would have led me to think that the case should have been settled then, but it wasn't. No, they said, we have a year and a half of damages related to the accident. We have $150,000 in damages related. We have a year and a half of pain and suffering. And they said for that year and a half, give them $750,000. But the fact is, only their expert says it's a year and a half. All the evidence was that this was a chronic, permanent condition for a guy who was absolutely fine. A career electrician before this accident. So if a year and a half is worth $750,000 and a 53-year-old man, what is 20 or 30 years worth? By defendant's own logic, this jury should have come in with more. But there is a, we made a huge statement of facts about what this man is going through. Three significant major injuries of which he is suffering dramatically. Cannot afford to get surgeries, obviously. And it's devastating. He's had a devastating life. His wife testified about it. His life's been ruined by this. So if that means $9 million is too much as a matter of law, then the court has to remit. But I wouldn't want to go through what he did. None of us would. Anything further? No, I mean, if there are other questions, I don't want to. No, I think you've answered what we are thinking about. Thank you, Your Honor. Now it's your turn. May it please the court. Counsel, once again, my name is John Pigore. I represent Corey Steele. We're asking this court to affirm the order of Judge Salganik, which granted a new trial. I'd like to get right to Hampton. Hampton is a case that we believe is helpful, and we believe it supports Corey Steele here. The issue on appeal, what happened there? It was a criminal case. Two defendants, one pled guilty and testified against the other. It was a bench trial. And the issue on appeal was whether or not the finding and the conviction, first-degree murder, felony murder, was against the manifest way to the evidence. And the court found that it was not against the manifest way to the evidence. What happened there is the trial court passed away before the post-trial motion could be heard. And a successor judge heard the post-trial motion, and the defendant argued that he could not get a fair post-trial motion because there's something unique to the trial judge, that only the trial judge can apply the standard that is typically applied in a post-trial motion, which is whether prejudicial error occurred. The question earlier, what standard does the trial judge who heard the case apply when he's hearing his own post-trial motion? He doesn't ask, gee, did I abuse my discretion when I made that ruling? No. The standard in a post-trial motion is whether prejudicial error occurred. And the argument that the defendant made in Hampton was only the trial judge can make that. No substitute judge can make that. Therefore, I did not get a fair post-trial motion. Therefore, I'm entitled to a new trial. And the appellate court rejected that. And the precise words they used, the precise words they used on appeal, the defendant argued, did not get a fair post-trial hearing because the successor judge could not reassess the arguments of the parties and the rulings made by the original judge. The court rejected that. And at 233, 113, 1096, it said, quote, we believe that another judge is capable of making that reassessment as well. Unquote. I think it's crucial that we understand that the successor judge can judge the post-trial motion on the same standard that the original judge would do it. Otherwise, there is a change in the substantive rights of the parties based on the chance that there's an administrative change in judge. And we can't have that. They could not allow that in Hampton, and it should not happen here. There was no form shopping in this case. This was the- Couldn't they argue it the other way, though, by letting, you know, there are a lot of judgment calls that trial judges make that an appellate court would affirm either way because they could go either way, and there's abuse of discretion is very deferential. The trial judge makes a ruling, and you bring in a new judge. If you allow that judge to introduce his or her own discretion to a ruling, they could find themselves in a situation where they're finding error where we might not have under an abuse of discretion. But they're not using that standard. They're just looking for error. They just look back at the rulings. They didn't make them because they weren't the trial judge. They go back and say, that seems wrong to me. I'm granting a new trial. Couldn't that be viewed as affecting the substantive rights of the parties? The parties had a trial in front of the judge. They're entitled to rely on those rulings. And if an appellate court comes in and changes those rulings, so be it. But if another judge, another trial judge comes in and just says, I see it differently and I'm reversing, isn't that unfair? I think that that is the question that the court addressed in Hampton. That's what the defendant was arguing in Hampton. And the court said, no, we can't accept that. We have to reject that. We find that the successor judge, now, for sure, the successor judge has to be thoroughly familiar with the record, which Judge Sulganik was here. He got a complete, he got a CD and he acknowledged this. He got a CD of the entire transcript, all the motions in limine, beginning to end. He's got the video, everything. And he made a record that he was thoroughly familiar with all of the factual basis on the points raised. One other thing I feel the need to point out. On this precise issue, the plaintiff's reply brief at page 2 argues that Hampton supports the plaintiff because they conclude that the court concentrated its rulings on the discretion of the trial judge. At page 2, they seem to be quoting Hampton where they say the decision whether to admit or exclude photographic evidence is reserved for the discretion of the trial judge. That subparagraph, single space indent seems to be a quotation. There is no photographic evidence at issue in Hampton. None. Next, subparagraph, single space indent suggesting a quotation. They argue the motion to sever is addressed to the sound discretion of the trial judge. There was no motion to sever in Hampton. Next, subparagraph indent suggesting this is a quote from Hampton, the order on presentation of evidence. There was no issue about presentation of evidence in Hampton. Last, again, subparagraph indent suggesting this is a quotation from Hampton, and it's not. Severing the closing argument in a third-party action is discretionary. None of that was at issue in Hampton. They didn't conclude and say this can all be found at page 397. There is no page 397. That site that they give is 223, 1088. There's no 397. So I feel that they certainly mischaracterized Hampton. And we believe that Hampton supports our view on the standard of care. Excuse me, on the standard of review. Another question for you. Was this a significant part of the case? Yes, it was, Your Honor. Yes, it was. On the question of prejudice, you know, the Supreme Court has told us in the Frieden-Skokie case that when the improperly admitted opinion is argued in closing, that shows prejudice. Three times they said three surgeries. Now, in context, please. But counsel, it was nearly a $10 million burden, just under $10 million, right? You've got $2 million for loss of normal life, already experienced $3 million for loss of normal life to be experienced in the future, $1 million for pain and suffering. You start going down, and then you get to the reasonable expense of medical care, treatment, and services reasonably certain to be received in the future. Future medical, 150. It's just a tiny little fraction. And the future hip surgery is just a fraction of the 150, right? I mean, we're granting a new trial on damages when the issue that you're complaining about at most could have affected a fairly infinitesimal portion of the award? I sincerely disagree with that, and here's why. $5.3 million in future non-economic damages, and certainly this business. Now, please, in context. Dr. Koh is a retained expert. In their 213s, they gave notice that he would give an opinion that the plaintiff will require hip replacement surgery in the future. There was a motion in limine to bar that on two grounds, qualification and foundation. That motion in limine was denied. Then when the plaintiff put Dr. Koh on the stand, there was an objection at trial, page 688. They objected again on qualification and foundation. Over the objection at trial, he was allowed to give the opinion that plaintiff will require future hip surgery, and he said, Dr. Koh said, quote, replacing the hip is not an uncommon thing to do in someone of his age after one hip surgery already, unquote. So they got it in. They got in hip replacement, even though there's no way he was qualified to say hip replacement. Okay? And that was the point that Judge Selganic pointed out. What was the case that said he was not qualified to give an opinion about hip replacement? We cited two cases in our brief. We cited two cases in our brief, and I have the notes here. Landers said a pathologist was not qualified to give an opinion on repairability of a neck wound. Glassman held that a clinical psychologist was not qualified to give an opinion that the decedent suffered brain injury. Now, certainly, I appreciate, and I suggest the Court does, too, that these cases are all highly fact-driven. Okay? Here, we have not only this disconnect between he's really not qualified to say hip replacement. Okay? In addition to that, there's just no foundation for this. Okay? Dr. Koh testified that he would defer to Dr. Shah as to whether plaintiff's ongoing hip pain was related to the accident. Nothing in the record says that hip pain is related to the accident. We all know Wilson v. Clark. We all know that they can come in and testify about what's in the records, of course. Nowhere is this in the records. But the objection basically was the qualification. It was both. The objection was both. Okay? In the motion to eliminate and at trial, it was both. Okay? Now, for sure, Judge Selganik said on the record in the February hearing on the post-trial motion, he said he did not find him qualified. Okay? And I agree he's not qualified. And I think we can all agree he's not qualified to say hip replacement, which they got in. Okay? But certainly, we are here asking this Court to affirm Judge Selganik's order on the entire record. And that entire record includes the motion to eliminate and the objection at trial on foundation. And there is no foundation for this. Okay? The Court testified he didn't really know whether Plaintiff's ongoing symptoms were caused by arthritis. Page 705. If it was arthritis, he couldn't say if it was before or after the accident. Again, page 705. And, you know, they cite 705. Page 705 in their brief. Again, I believe that what Justice Ellis stated before is of no consequence. Well, okay. You know, here we are with 5.3 million in non-economic damages. And if we can agree, okay, if we're going to get to the point and ask was there really any prejudice, I would submit that at that point we're going to assume arguendo that we have prejudicial error. Okay? And now we're saying, well, it didn't really matter that much. Okay? I submit 5.3 million in non-economic damages is shocking. Okay? For a man who is able to work light duty. For a man who testified that he's applied for hundreds of jobs. For a man who under the strength test can lift 43 pounds, you know, shoulder height. For a man who, while true, he testified that he doesn't enjoy activities, kayaking, hiking, and that kind of thing. It's a man who was filmed shoveling snow. It's a man who was filmed cutting grass with a riding lawnmower. Okay? 5.3 million in future damages for a man who can do all this. Okay? I submit that that's shocking. And I also submit that in context, I would ask this court to consider that we don't just ask is it shocking or not shocking. Because if it is shocking, I think we take the next step. And we ask did something go wrong in this trial that caused a shocking verdict? And the answer is yes. Something went very wrong. Okay? Something went wrong almost every day in this trial. Okay? Because what we had was not only this prejudicial error about hip replacement. Okay? We had misconduct that Judge Lynch found almost every day. Starting with the opening statement. When they said thank you, Corey, for finally admitting liability two weeks before trial. Judge Solganic reprimanded them, admonished them for that. Now, he did instruct the jury to disregard it because of an objection made. He instructed the jury to disregard it. But he found that that was prejudicial. Okay? Then this whole thing with the video. With the pounding of the fists and the constant reference to collision. Judge Solganic took them into chambers and again admonished them that this was prejudicial. And then finally, the sort of coup de grace, if you will, when the plaintiff was testifying on direct and plaintiff's counsel walked him through very specific leading questions on foundational things. Where were you? What were you doing? That kind of thing. And then he gets to this question. He says, and what happened next? And the answer was, well, Corey didn't really seem to care about my injury. I asked for medical care and they didn't seem to care. And then what happened next? Well, they took me and they wanted my statement and I told them I was hurt and I needed an ambulance. They didn't really seem to care and they delayed treatment. Judge Lynch blew a gasket when they did this. And he took them into chambers and he said that was intentional, that was purposeful, and it was inflammatory. Again, he instructed them and there was an objection. Then he instructed the jury to disregard it. Okay. There's no way to know what Judge Lynch would have done had he not recused himself. I can assure you of this. There is no way I was going to do anything to get Judge Lynch off of this case. He had already found prejudicial misconduct. There was no form shopping here. We should use the Hampton standard. But be that as it may, okay, what really happened here, there was prejudice almost every day of this trial. It was misconduct by the plaintiff's attorney. It was this inadmissible evidence. And that's how we got $5.3 million in future non-economic damages for a man who can work, for a man who shovels snow, and for a man who cuts grass. And for those reasons, Your Honor, we are asking this Court for two forms of relief. Number one, affirm Judge Sulganik, please. But if for some reason you cannot, then grant a substantial remitter. Thank you. One question. I'm still not clear on it. Yes, sir. And that gets back to the standard that Judge Sulganik uses when he considered the issue of the admissibility of Kohl's testimony. Is the standard that he used deferential to Judge Lynch? Does he look at it, do local? That is a very, very good question. And the answer is going to take a minute. We have time. So here's what I want to say on that. I went back, because they raised this. I went back and looked very carefully at my post-trial motion. And what I said, and I have it here, and I really want to be specific about this. Because I brought it with. And what I said in the record, page C036, I said with respect to the video, the question is whether or not Judge Lynch abused his discretion. And at the February hearing, Judge Sulganik actually said, I do not find that Judge Lynch abused his discretion with respect to the video. Then at page C40, which is the second point of the argument, I said that the standard here is whether or not there was prejudicial error with respect to Dr. Kohl. And again, at the February hearing, what Judge Sulganik said was, I find it was error to allow the opinion of Dr. Kohl. Then, very interesting. Does that mean error as a legal issue, as a matter of law, he should not have been allowed to testify? Yes. Yes. So I've, coincidentally or not, okay, I split it up that way in my post-trial motion. And that is the way Judge Sulganik actually ruled. And then to sort of drive home this point about what standard did Judge Sulganik actually use, after the post-trial motion was decided, plaintiff came back on an emergency motion to have the case remanded to Judge Lynch to find out why he recused himself. And Judge Sulganik denied that motion. But there's a very interesting colloquy back and forth at the very beginning of that hearing when plaintiff's attorney steps up and says, Judge Sulganik, you're very familiar with this case. This is a case where you reversed an abuse of discretion. Judge Sulganik says, no, I didn't. He says, I ordered a new trial. Counsel says, yes, you did. And there's a bit of an argument there between trial counsel and trial judge. And trial counsel says, yes, you did. And Judge Sulganik says, no, I didn't. And then I think he said, well, you're the boss. Okay. But I think that that was very telling because what Judge Sulganik, so the whole record all the way through here on this Dr. Koh issue, was that the standard he was asked to apply, the standard that he did apply, was not abuse of discretion. It was prejudicial error. And when he was challenged on that, he stood his ground and said, no, I did not find abuse of discretion. I found error. So it's a long-winded answer to your question, Judge, but I hope that answers your question. So, okay. That may be what he did. Was that correct? Yes, absolutely correct. Yes, it's absolutely correct. For a case that says that. Well, I think that the closest thing we've got is Hampton. Okay. The closest thing we have is Hampton. Here's what the plaintiff here was asking for balsenius. And there's no way that this is balsenius. Okay. There's good reason why, and the Supreme Court makes this very clear, why a successor judge shall not at this point vacate or modify a discretionary discovery order absent change of circumstances or additional facts. Okay. That is not a post-trial motion. Okay. For the reasons I've gotten into already, but in addition, I would like to add that almost by definition, there are additional facts in a post-trial motion because the whole trial is done. And when a judge asks, was there prejudicial error, it can really, I want to say only, but I think that certainly it can be the case that prejudice only emerges at the end of the case. Okay. We don't know. Judge Lewis didn't really know what impact any one of these prejudicial things could have had until he gets to the end of the case. Then you add them all up and you say, oh, my gosh. Yeah. So I think that it has to be that the successor judge applies the same standard, and I think Judge Sulganic got it right. All right. Thank you. Thank you very much, Your Honor. Again, we're asking the Court to affirm Judge Sulganic's order. Or remitted her. I'm sorry? Or remitted her. Or remitted her. Yes, sir. Thank you very much. Thank you. If we did miscite Hampton, it's the last thing I want to do. But I do remember the language defense talking about, because Hampton did say that. It says, you can re-access arguments. Well, that's exactly what you're doing. You're re-accessing arguments. It never, never said, you have the discretion and you can apply your discretion against a trial court's discretion. No case says that. If Hampton said that, defense counsel would be saying that right now. No case says that. They said, you can re-access arguments. I agree. Of course you can re-access arguments. You're re-accessing the arguments. I also want to point out that Judge Sulganic did not say a word about what the prejudice was, because there was no prejudice. The injury is far worse if there's no cure. The defendant says, you know there's prejudice because of the verdict. But look at the verdict. If that's true, it's 150,000 in medical bills. There's no way on a hip replacement, shoulder surgery, major shoulder surgery, major back fusion. No way. No way. That's healing in two surgeries before the accident, lesser surgeries. And I know the question was asked, would the judge have, you know, what does Judge Lynch do? And I think Judge Lynch would say, you know, when this man laid a foundation, because the defendant objected, and the doctor, and he said lay a foundation, and the doctor testified about how often he suggests, basically on a routinely daily basis, I don't remember the exact words, but he routinely makes recommendations regarding hip surgeries. He testified that. That's more than enough. Okay? And the judge says, okay. After he listens to all of it, he says, fine, testify to it. And then he says, based on a reasonable degree of medical certainty, I believe he will get knee to surgery to be determined by another surgeon. Okay? So the judge would say, you know, that's all fine. Now, you raise all these issues based on cross. Well, there was never another objection. How am I supposed to do something if you're not going to object? You know, what am I supposed to do? And that's where I'm saying, yeah, good cross examination. Let me go on appeal and just say my cross was good. New trial. And that's what this is amounting to, because the damage that they're claiming was done in cross, and then they stayed silent. I mean, they never said a word. Even in the post-trial motion argument they worked, this was not even a significant argument. This was a shock to everybody. It was. This was not even the main argument. The main argument was the video. They're looking at someone's feet. As to arthritis and hip pain, we cited where Rubenstein, the orthopedic surgeon, testified that his labrum was taken out. It was like a wheel without a socket or whatever he said, and that's how this guy is walking without it. So it's clunking around. And it was related to the accident. I mean, arthritis related to the accident. So did the defendant's expert. The defendant asked his expert, what's the cause of the pain? Arthritis. Arthritis. Now, he thinks it's all preexisting. He thinks it has nothing to do with the accident, to be honest there, but it's still uncontradicted testimony. Arthritis, arthritis, arthritis is causing his problems. What do they do for arthritis in a 53-year-old man? This wasn't ingenious serious arthritis without a labrum. This wasn't ingenious testimony by Dr. Koh. He doesn't just flail around opinions. He testified that the treating physicians, if you remember, one of his bases was that the treating physicians were already talking about a hip replacement. That was in the record. He had already, in the record, according to Dr. Rubenstein, in his notes, they were talking about waiting for requests for surgery or requests for pending surgery pending. So they heard this from others. It's in the record. It's in what we – and I can read it to you if anybody wants me to. Okay. All right. I may be going too far. As to attorney misconduct that the defendant talked about, if this is attorney misconduct, every trial is going to be worse. I mean, they made a claim. They asked the plaintiff, they cross-examined it at length on the video when they stipulated that impact was not an issue. It was already stipulated. They cross-examined it for 30 minutes on the photos, 30 minutes on the impact. And then they said the crane hit you. If I had said that, they'd be going crazy. Reverse it. Reverse it. They said the crane hit the plaintiff. I mean, every little thing is being looked at. Almost everything the defendant talked about, there was no objection. It was the judge who made the objection. And that is unusual in cases. I mean, I've been trying cases for 35 years. It's not common. And he ran a strict courtroom. He's a very intelligent judge. And he ran a strict courtroom. And when he saw something on a sidebar, he let us know. And he let us know very firmly that he would deal with this. And, okay, you know, but nothing was done intentionally. I mean, this is a trial, and there is advocacy. So are there any questions that I can answer? No, just as counsel indicated, you indicated remitted or is it possible? You're not for it, but you aren't 100% against it. All I would ask is that if you're going to remit, please read the facts of what this man has gone through, because I don't think you would remit. All right. Thank you very much. You both were very, I don't know how to put it. The best I've seen in a long time, both of you. It was very good. Thank you.